Donald W. BECKETT, Plaintiff,

v.

Sangor B. POWERS, Ramon Gray, Harvey Winans, Sgt. Hilt, Defendants.

Ralph WILLIAMS, Plaintiff,

v.

Wilbur J. SCHMIDT, John R. Gagnon, Gaylord Thomas, Robert Ganz, Defendants.

Ralph WILLIAMS, Plaintiff,

v.

Manuel CARBALLO, John R. Gagnon, James Boorman, Nathan Franke, (Officer) Dykstra, Defendants.

Jerry WEATHERALL, Plaintiff,

v.

Manuel CARBALLO, John R. Gagnon, James Boorman, Mr. and Mrs. Robert Cook, Mr. and Mrs. John Thalacker, Defendants.

Nos. 74–C–205, 75–C–439, 76–C–109 and 76–C–61.

United States District Court,
W. D. Wisconsin.

Aug. 4, 1980.

Lester A. Pines, Madison, Wis., for plaintiffs.

Pamela Magee-Heilprin, Asst. Atty. Gen., Madison, Wis., for defendants.

CRABB, District Judge.

■ These suits raise questions concerning the application of the Fourth Amendment's prohibition against unreasonable searches and seizures to searches of cells in which prison inmates reside. Plaintiffs, all of whom were incarcerated in Wisconsin state correctional institutions at the time of the events which gave rise to this action, contend that defendants deprived them of rights guaranteed to them by the Fourth Amendment, and request monetary relief pursuant to 42 U.S.C. § 1983.[1] Jurisdiction is predicated upon 28 U.S.C. § 1343(3).

These suits are now before the court on plaintiffs' motions for partial summary judgment and on defendants' cross-motions for summary judgment.

Plaintiffs and defendants have stipulated to a detailed description of the parties and of the events underlying these suits. From this stipulation, I find that there is no genuine issue with respect to any of the following material facts.

## FACTS

Each of the plaintiffs was subjected to a search of his cell conducted by a prison official in the inmate's absence. In the course of each of these searches contraband items were located and, subsequently, each of the plaintiffs was found guilty of violating an institutional rule prohibiting possession of contraband items and punished accordingly. In each case, the search was "undertaken pursuant to an institutional policy of conducting periodic searches of inmates' cells without advance notice, for the purpose of locating and removing contraband items," and "this policy was acquiesced in by all of the named defendants."

## OPINION

■ It is settled law that prisoners have no constitutional right to be free from all searches that are conducted without warrants or probable cause. The United States Court of Appeals for the Seventh Circuit has indicated that any argument on this point would be "obviously without merit." *Bonner v. Coughlin*, 517 F.2d 1311, 1317, n.16 (7th Cir. 1975). However, in the same case, the court of appeals made the statement that convicted persons retain some Fourth Amendment protection, albeit in a less extensive form than that enjoyed by unincarcerated members of society. *Id.*, at 1317. This leaves open the question of what form this retained protection takes.

■ The legal issue presented by the cases before the court is whether the Constitution permits an inmate's cell to be searched *outside of his presence*, pursuant to an institutional policy of conducting cell searches for the purpose of locating and removing contraband items or whether the inmate's retained Fourth Amendment rights prohibit such searches as a general practice.

In a recent case raising facts similar to those presented in these actions, the United

---

1. When they commenced these suits, plaintiffs also sought equitable relief. However, since all three plaintiffs have now been released from incarceration, their claims for equitable relief are moot. *Ross v. Mebane*, 536 F.2d 1199 (7th Cir. 1976).

States Supreme Court upheld the constitutionality of cell searches conducted outside the presence of the detainee-inmates at a pretrial detention center. *Bell v. Wolfish*, 441 U.S. 520, 557, 99 S.Ct. 1861, 1883, 60 L.Ed.2d 447 (1979). Thus, the threshold issue to be addressed in this opinion is whether the Court's opinion in that case dictates the outcome of the cases before this court. Clearly, the answer is that it does.

In *Wolfish*, the Court was evaluating the constitutionality of two categories of conditions, practices, or restrictions: (1) those which implicated only the protection against deprivation of liberty without due process of law and (2) those which implicated specific constitutional guarantees, such as those encompassed in the First and Fourth Amendments. In a wide-ranging opinion, the Court considered the constitutionality of such practices as body searches, double-bunking in cells designed for single occupancy, restrictions of the source of hardcover books, and the prohibition of receipt of packages of food and personal items from outside the institution, as well as cell searches conducted outside the presence of the detainee.

With respect to the first category of conditions, the Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee." *Wolfish*, 441 U.S., at 535, 99 S.Ct. at 1872.[2] With respect to *both* categories, the Court emphasized the requirement of judicial deference to the judgments of prison administrators:

[E]ven when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

\*  \*  \*  \*  \*  \*

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

\*  \*  \*  \*  \*  \*

"Such considerations are peculiarly within the province and professional expertise of correctional officials and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S., at 827, 94 S.Ct. at 2806.

*Id.*, at 547–548, 99 S.Ct. at 1878–1879.

At first reading, it is difficult to reconcile the Court's treatment of the claims raised in *Wolfish* with the principle the Court reiterates in the case that convicted persons do not forfeit all constitutional protections by reason of their confinement.[3] Even with

---

2. In *Wolfish*, the lower courts had analyzed the conditions and restrictions to which pretrial detainees were subjected as constitutional only to the extent to which they " 'inhere in [the inmate's] confinement itself or  .  .  .  are justified by compelling necessities of jail administration.' " *Wolfish v. Levi*, 573 F.2d 118, 124 (2nd Cir. 1978), quoting *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974).

3. [W]e have held that convicted persons do not forfeit all constitutional protections by reason of their conviction and confinement in prison. *See Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532,

2538, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974–2975, 41 L.Ed.2d 935 (1974); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell, supra*, at 555–556, 94 S.Ct. at 2974–2975. So, for example, our cases have held that sentenced prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments, see *Pell v. Procunier, supra* ; *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); that they are protected against invidious discrimination on the basis of race

repeated readings, it is not easy to extract from the opinion a principled mode of analysis which will continue to give meaning to the concept of retained rights.

I conclude that, despite its broad holding in *Wolfish*, the Court stated a general rule of judicial deference, but not of judicial abdication. The broad discretionary powers of prison officials under those decisions are not unlimited. When a challenged prison practice intrudes upon a specific constitutional guarantee, the language and logic of *Wolfish* require judicial deference to the judgment of prison administrators only if: (1) the practice serves the needs of the institution for security, order and discipline, *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878; (2) the practice reflects an *informed* judgment of prison administrators, *Id.*, at 547, n.29, 99 S.Ct. at 1878, n.29; and (3) the practice is not an exaggerated response to legitimate institutional needs, *Id.*, at 548, 561–2, 99 S.Ct. at 1878, 1885–1886. Thus, the *Wolfish* rule of deference does not preclude all judicial review of prison practices. However, it does mean that when the prison practice has a security purpose, there is a heavy burden on those challenging the practice. In this regard, *Wolfish* distinguishes prisoners from other plaintiffs in constitutional suits. For prisoner-plaintiffs in Fourth Amendment suits, for example, *Wolfish* states an exception to the general rule that when a warrantless search occurs, the burden is on the *defendants* to prove that the search was reasonable and, therefore, constitutional. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

> under the Equal Protection Clause of the Fourteenth Amendment, see *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); and that they may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law, see *Meachum v. Fano, supra*; *Wolff v. McDonnell, supra*. A fortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.

Restricting the rule of judicial deference to cases in which the constitutionally intrusive practice has a security purpose is a logical consequence of the way in which the Supreme Court defines the constitutional rights of prisoners. According to the Court, an incarcerated person does not possess the full range of freedoms possessed by an unincarcerated person. *Wolfish*, 441 U.S., at 546, 99 S.Ct. at 1877–1878. Neither, however, does incarceration cause an individual to forfeit all constitutional protections. *Id.*, at 545, 99 S.Ct. at 1877. Under what circumstances, then, may a prisoner's constitutional rights be limited or withdrawn? The answer given in *Wolfish* is: when it is justified by the goals underlying our penal system, the most important of which is internal security. *Id.*, at 547, 99 S.Ct. at 1878 (citing *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Any practice that infringes a constitutional guarantee is therefore to be evaluated in terms of the institution's need for security. *Bell v. Wolfish*, 441 U.S., at 547, 99 S.Ct. at 1878.

The Court's restriction of the rule of judicial deference to practices which reflect an informed judgment by prison administrators is a natural result of the rationale behind the rule. According to the Court, deference is to be accorded the judgments of prison administrators regarding practices which they believe serve the security needs of the institution, because "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials." *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806 (1974), quoted in *Wolfish*, 441 U.S., at 548, 99 S.Ct. at 1878–1879.[4]

*Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877 (1979).

4. In *Wolfish* the Court goes on to say:
   [J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.
   *Wolfish v. Bell*, 441 U.S. 520, 548, 99 S.Ct. 1861, 1878–1879 (1979). Standing alone, this statement might appear to create a broader

Since the rule of deference is justified by the premise that the decisions of prison administrators are informed, it would seem that it would be an abuse of discretion for them to act in a manner that infringes a constitutional protection without first acquiring and weighing information regarding the necessity for the action and its intrusiveness vis-à-vis the inmates.

■ Even when a prison practice has a security purpose and is the result of informed decision-making by prison officials, there is a further requirement that it not be an exaggerated response to the institutional needs. *Wolfish*, 441 U.S., at 548, 99 S.Ct. at 1878–1879. If it is an exaggerated response, then it constitutes punishment, and falls within the scope of the due process clause. *Id.*, at 561, 99 S.Ct. at 1885–1886.

However, none of this analysis is triggered unless the challenged condition, procedure, or regulation implicates a constitutional right of the inmate. "[T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute." *Wolfish*, 441 U.S., at 562, 99 S.Ct. at 1886.

rule of deference than I have construed *Wolfish* to state. Read in context, however, it does not. Neither of the two cases cited in *Wolfish* following the quoted passage supports a more expansive rule of deference than the one I have described. In the first case, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Court allowed the challenged prison policy to stand, not because the subject matter was unsuited for judicial review, but because the court found that there was no constitutionally protected liberty interest infringed by the policy. *Id.*, at 225, 96 S.Ct. at 2538. In the second case, *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) the Court upheld the district court's invalidation of the challenged prison regulations. The Court stated a general policy of judicial restraint in matters of prison administration, but went on to say

[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

It appears that, in evaluating the cell-search policy, the Court made the implicit finding that no constitutional right was implicated by the presence or absence of the inmate during the search. The Court began with the proposition that a search of a prisoner's living area is an appropriate and legally-permissible security measure. Noting that, in the lower court opinions in *Wolfish*, neither the district court nor the court of appeals had held that unannounced, warrantless searches of inmates' personal property were improper, the Court went on to say that, "permitting detainees to observe the searches does not lessen the invasion of their privacy." *Id.*, at 557, 99 S.Ct. at 1883.[5] The Court concluded that conducting such a search in the prisoner's absence "simply facilitates the safe and effective performance of the search" without adding to the invasion of the prisoner's rights.

It seems reasonable to conclude from these statements that the Court has foreclosed any inquiry into the constitutionality of the practices challenged in the cases before the court, on the ground that the inmate's presence or absence during a cell

*Id.*, at 405–6, 94 S.Ct. at 1807–8.

5. The district court had held unconstitutional the absent-inmate aspect of the cell searches, finding that the inmate's presence had not been shown to impede the search procedure. *United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114, 149 (S.D.N.Y.1977). Reviewing the findings of the trial court, the court of appeals said:

We see no reason whatsoever not to permit a detainee to observe the search of his room and belongings from a reasonable distance. This is a small privilege to grant him and reassures the detainee's already diminished sense of control over self, that he still has some small private domain, while at the same time not interfering with the institution's security concern and the removal of possible contraband. *See Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D.N.Y.1975). And, of course, any detainee who becomes obstructive may be removed from the vicinity of his room.

*Wolfish v. Levi*, 573 F.2d 118, 132 (2nd Cir. 1978).

search implicates no constitutional right of the inmate since, as a matter of law, it does not infringe upon his expectation or enjoyment of privacy under the Fourth Amendment.[6] There is an indication, however, that not every aspect of the constitutional inquiry has been foreclosed. In the accompanying footnote, the Court implies that there may be specific situations in which the *conduct* (as contrasted with the *fact*) of the search might be so abusive and disrespectful of the inmate's possessions as to rise to a constitutional violation.[7]

Neither *Wolfish* nor the instant cases raise a claim of general or specific abusiveness in the conduct of cell searches.[8] *Cf., Bonner v. Coughlin*, 517 F.2d 1311. Therefore, I find myself bound by the holding in *Wolfish* to deny the plaintiffs' motions and to grant the defendants' motions for judgment in their favor.

■ The same result would be reached even if I were to proceed on the basis that the absence of the inmate during a search of his cell does implicate a specific constitutional guarantee. In analyzing the validity of any prison practice that arguably infringes upon a specific constitutional guarantee such as the Fourth Amendment, *Wolfish* requires deference to the judgment of defendant prison officials unless plaintiffs can show that the practice does not serve a security purpose, is not the product of informed decision-making, or is an exaggerated response to the institutional need for security. The burden on the plaintiffs to prove that defendants have abused their discretion is substantial.

■ Although it is not possible to determine from the records in these cases whether a concern for security actually underlies the challenged practice of conducting cell searches in the inmate's absence,[9] I must

---

6. Applying a different analysis in its decision, the district court which heard *Wolfish* found absent-inmate cell searches constitutional when the inmate was a convicted and sentenced offender, not because such persons did not suffer an invasion of their privacy by such searches, but because for them, the justification for such a search need not be compelling and any explanation for the practice which was "not weightless," satisfied the constitutional test. *Wolfish*, 439 F.Supp., at 150.

7. The cited footnote reads as follows:

It may be that some guards have abused the trust reposed in them by failing to treat the personal possessions of inmates with appropriate respect. But, even assuming that in some instances these abuses of trust reached the level of constitutional violations, this is not an action to recover damages for damage to or destruction of particular items of property. This is a challenge to the room-search rule in its entirety, and the lower courts have enjoined enforcement of the practice itself. When analyzed in this context, proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees. *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S., at 128, 97 S.Ct. at 2539.

*Wolfish*, 441 U.S., at 557, n.38, 99 S.Ct. at 1883–1884.

8. Plaintiffs do raise the issue of the *potential* for abusiveness as implicit in the practice of conducting the search in the inmate's absence. In their brief, they assert that they have no way of knowing the scope of the searches which are conducted. "The prison officials may have read correspondence, examined family photographs or intruded into other private possessions of the plaintiffs. Plaintiffs can never know the scope of the searches because they were not present." Plaintiffs' brief at 10. It is evident that these plaintiffs do not share the view of the Supreme Court that the search of their cells in their absence does not constitute a significant, additional intrusion into their privacy.

9. The statement of the search policy to which the parties have stipulated omits any reference to the absent-inmate aspect of these searches. The answer in *Williams v. Schmidt* does contain an allegation that defendant Gagnon, warden of the prison in which Williams was confined, "reasonably believes [the search regulations] to be appropriate and integrally interwoven with security." Answer, ¶ 9. Similarly, the answer in Beckett contains the following averment:

[I]t is absolutely necessary and imperative to the successful and trouble-free operation of maximum-security penal institutions such as the Wisconsin State Prison that duly-authorized prison administrators be able to make general and random searches of cells in order to uncover dangerous weapons and contraband that might otherwise threaten the

assume that it does. In *Wolfish*, the Court stated that, "no one can rationally doubt that room searches represent an appropriate security measure . . . ." *Id.*, 441 U.S., at 557, 99 S.Ct. at 1883. The burden is upon plaintiffs to show the lack of a security purpose, but they have not made such a showing and there is nothing in the record to suggest that the security interests served by the absent-inmate search policy upheld in *Wolfish* are not likewise served by the absent-inmate searches challenged here.[10] Viewing the pleadings most favorably for plaintiffs, it is clear that they have not alleged facts sufficient to prove that the challenged search practice is unrelated to the security needs of the prisons, or that the practice is arbitrary in that it was the product of uninformed decision-making, or that it is so excessive a response to legitimate security concerns as to constitute punishment.

In sum, there is nothing in the record of these cases to distinguish them significantly from *Wolfish*. Accordingly, IT IS ORDERED that plaintiffs' motions for partial summary judgment are DENIED and defendants' motions for summary judgment are GRANTED.

---

safety and security of the institution, its inmates, staff, or visitors. Answer, ¶ 8. However, neither of these statements specifically addresses the absent-inmate aspect of the searches. The answers of the defendants in *Weatherall* and in *Williams v. Carballo* contain nothing at all regarding the rationale for the absent-inmate or any other aspect of the searches. The only reference to the rationale for searching in the absence of the inmates is the statement in defendant's brief that, "Given the nature of the institutional setting it is not unlikely that unnecessary behavior disruptions could occur" if inmates were allowed to remain and observe the searches of their cells. Brief, page 7.

**10.** The Supreme Court summarized the danger of allowing inmates to be present at searches as follows:

[O]fficials testified that permitting inmates to observe room inspections would lead to friction between the inmates and security guards and would allow the inmates to attempt to frustrate the search by distracting personnel and moving contraband from one room to another ahead of the search team.

*Bell v. Wolfish*, 441 U.S., at 555, 99 S.Ct. at 1882–1883.